**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE
PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL
A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY
COURT.  THIS DISCLOSURE STATEMENT WILL BE SUBMITTED FOR
APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.
THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND THIS DISCLOSURE
STATEMENT AT ANY TIME PRIOR TO THE DISCLOSURE STATEMENT
HEARING**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK          x

In re:                                              Chapter 11

WOOZYFLY, INC.                              Case No. 09-13022 -JMP

                         Debtor.

                                           x

**FIRST AMENDED DISCLOSURE STATEMENT ACCOMPANYING FIRST
AMENDED PLAN OF REORGANIZATION DATED NOVEMBER 23, 2009 PROPOSED
BY THE DEBTOR AND CO-PLAN PROPONENT MKM OPPORTUNITY MASTER
FUND, LTD.**

**OLSHAN GRUNDMAN FROME
ROSENZWEIG &WOLOSKY LLP**
Counsel for the Debtor

Michael S. Fox, Esq.
Andrea Fischer, Esq.
Jordanna L. Nadritch, Esq.
Park Avenue Tower
65 East 55th Street
New York, New York 10022-1106
Telephone:  212.451.2300
Facsimile:  212.451.2222

Table of Contents

Page

ARTICLE I        SUMMARY OF THE PLAN ................................................................ 1

1.1.    Introduction ................................................................................................. 1
1.2.    Voting Procedure And Instructions ............................................................. 3
1.3.    Disclosure Statement Enclosures ............................................................... 5
1.4.    Confirmation Of The Plan .......................................................................... 5
1.5.    Recommendations With Respect To The Plan ........................................... 6
1.6.    Disclaimer .................................................................................................. 6

ARTICLE II       DEBTOR'S HISTORY AND BUSINESS BACKGROUND ....................... 9

2.1.    Business Description ................................................................................... 9
2.2.    Circumstances Leading to Chapter 11 ....................................................... 9
2.3.    Capital and Financial Structure ................................................................ 10

ARTICLE III      SIGNIFICANT EVENTS DURING THE BANKRUPTCY ........................ 11

3.1.    Voluntary Petition .................................................................................... 11
3.2.    Employment of Professionals ................................................................... 12
3.3.    Claims Bar Date ....................................................................................... 12
3.4.    Debtor in Possession Financing ............................................................... 12

ARTICLE IV      FINANCIAL STATUS .................................................................... 12

4.1.    Debtor's Liabilities ................................................................................... 12
4.2.    Debtor's Assets ........................................................................................ 13

ARTICLE V       THE PROPOSED MERGER ............................................................. 13

5.1.    Introduction .............................................................................................. 13
5.2     Old STW ................................................................................................... 14

ARTICLE VI      DESCRIPTION OF THE PLAN ........................................................ 19

6.1.    Introduction .............................................................................................. 19
6.2.    Treatment of Unclassified Claims ............................................................ 19
6.3.    Treatment of Classified Claims ................................................................ 20
6.4.    Conditions Precedent to the Effective Date ............................................. 22
6.5.    Merger ...................................................................................................... 23
6.6.    Certificate of Incorporation and By-Laws of Reorganized Debtor,
        Directors and Corporate Action. ............................................................... 23
6.7.    Cancellation of Instruments and Stock ..................................................... 24
6.8.    Issuance of Reorganized Debtor Reorganized Debtor Common Stock
        and Reorganized Debtor Convertible Preferred Stock .............................. 24
6.9.    Continuation of the Debtor and Reorganized Debtor ............................... 25
6.10.   Dissolution of C.J. Vision Enterprises, Inc ............................................. 26
6.11.   Settlement of Disputed Claims Prior to the Effective Date ...................... 26
6.12.   Operating Reports .................................................................................... 26
6.13.   Distributions ............................................................................................ 26

i

Table of Contents
(continued)

Page

6.14.   Effects of Confirmation ........................................................................... 29
6.15.   Insurance .................................................................................................. 31
6.16.   Retention of Jurisdiction .......................................................................... 32
6.17.   Miscellaneous Provisions of the Plan ...................................................... 33

ARTICLE VII   RISK FACTORS .................................................................... 36

7.1.    Bankruptcy Considerations ...................................................................... 37

ARTICLE VIII  FEASIBILITY OF THE PLAN ................................................ 38

ARTICLE IX    BEST INTERESTS TEST ........................................................ 39

ARTICLE X     TAX CONSEQUENCES ........................................................ 41

10.1.   Tax Consequences of Confirmation ......................................................... 41
10.2.   Tax Consequences to the Debtor ............................................................. 41
10.3.   Disclaimer ................................................................................................ 42

ARTICLE XI    SECURITIES LAW MATTERS (Bankruptcy Code § 1145
                     Exemption) .......................................................................... 42

ARTICLE XII   CONCLUSION ...................................................................... 44

794886-16

# ARTICLE I
## SUMMARY OF THE PLAN

1.1.    **Introduction**.  The Plan Proponents,[1] who are the Debtor together with the DIP

Lender, MKM Opportunity Growth Fund, Ltd., are soliciting votes from creditors of the Debtor

for the acceptance of the Plan of Reorganization for the Debtor.  The Plan Proponents submit

that a liquidation pursuant to Chapter 7 of the Bankruptcy Code is unlikely to yield material

proceeds as the Debtor's only assets are a corporate public shell and some intellectual property.

STW Resources Inc. ("Old STW"), an unrelated privately held company, will then merge with

and into a newly formed wholly owned subsidiary of the Reorganized Debtor on the Effective

Date ("STW Sub").  Shares of the Reorganized Debtor will be distributed among current Old

STW shareholders and holders of claims against the Debtor.  The Reorganized Debtor thereafter

will be a company reporting under the Securities Exchange Act of 1934, as amended, known as

STW Global, Inc.  ("New STW").

The Plan is predicated on the financial support of the DIP Lender who has

provided substantial contributions and assistance to the Debtor, including a loan to the Debtor of

$100,000, to help effectuate the Plan and to preserve Woozyfly's public corporate shell and its

remaining assets.  To the extent the Plan is confirmed by the Bankruptcy Court, the DIP Lender

has agreed to forgo a cash distribution on its DIP Claim for the DIP Loan.  In lieu of a cash

distribution, the DIP Lender has agreed to accept in full satisfaction of its DIP Claim, an 8.56%

stake in the Reorganized Debtor in the form of Reorganized Debtor Common Stock and

Reorganized Debtor Convertible Preferred Stock, leaving 5.71% of the Reorganized Debtor

Common Stock in the Reorganized Debtor to the Debtor's secured lenders, and 85.73% of the

---

[1]  Capitalized terms not defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan;
however, for clarity and ease of reference, some of the definitions are repeated herein.

Reorganized Debtor Common Stock in the Reorganized Debtor to current shareholders of STW. Additionally, the DIP Lender has agreed to provide a portion of its Reorganized Debtor Common Stock distribution to the General Unsecured Creditors who would have otherwise not have received a recovery.

This Disclosure Statement sets forth information regarding the Debtor's pre-petition history, significant events that have occurred during the Case, the Debtor's assets and liabilities, and the reorganization and anticipated post-reorganization operations and financing of the Reorganized Debtor.   This Disclosure Statement also describes the terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the securities to be issued under the Plan and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims eligible to vote must follow for their votes to be counted.  Factual information concerning the Debtor contained in this Disclosure Statement has been provided by the Debtor's management and public sources.

Holders of the Noteholder Claims and General Unsecured Claims are impaired under the Plan and are entitled to vote.   The Plan cancels all equity interests in the Debtor. Holders of Interest will receive no distribution under the Plan, and are deemed to have rejected the Plan without voting.  For this reason, the votes of Interest Holders are not solicited.

**The Plan Proponents are asking that all holders of Noteholder Claims and General Unsecured Claims vote to accept the Plan.** For a summary of the Plan, please see Article VI hereof.  For a discussion of certain factors to be considered prior to voting, please see Articles VII, VIII, IX X, and XI hereof.

The following table summarizes the projected treatment accorded creditors and shareholders of the Debtor under the Plan:

2

| Class | Description | Treatment | Entitled to Vote | Estimated % Recovery |
|---|---|---|---|---|
| NA | Administrative Expense Claims --Debtor's professionals | Payment in full (or as otherwise agreed) | No | 100% |
| NA | Priority Tax Claims | Payment in full (or as otherwise agreed) | No | 100% |
| NA | DIP Claim | DIP Claim Distribution | No | 100% |
| 1 | Non-Tax Priority Claims | N/A | N/A | N/A |
| 2 | Secured Claim -- | N/A | N/A | N/A |
| 3 | Noteholder Claims | Noteholder Distribution | Yes | 6.05%[2] |
| 4 | General Unsecured Claims | General Unsecured Claims Distribution | Yes | 5.61%[3] |
| 5 | Interests in Debtor | Interests Cancelled | Deemed to Reject | 0% |

     1.2.    **Voting Procedure And Instructions.**  In accordance with section 1126(f) of the

Bankruptcy Code, only Classes of Claims and Interests that are impaired under a plan may vote

to accept or reject a plan.  Unimpaired Classes are conclusively presumed to have accepted the

Plan.  A Class is Impaired if the legal, equitable or contractual rights attaching to Claims or

Interests in that Class are modified other than by curing defaults and reinstating maturity of

obligations or payment in full in Cash.

---

[2] This recovery estimate is based on the value of the Debtor's corporate public shell, its intellectual property, and the current capitalization of STW.  This amount has not been verified by an independent financial analyst, and is merely based on the Debtor's estimate of the value of the Debtor's assets and of the book value of STW based on its September 30, 2009 financial reports.  Additionally, although Old STW has an accumulated deficit, there is still positive shareholder equity, and the Reorganized Debtor plans additional capital raises.  Moreover, Old STW has also entered into several agreements that should bring revenue within the next six months.  While this cannot be guaranteed, Old STW and the Debtor believe there is a high probability of success.

[3] This recovery estimate is based on the value of the Debtor's corporate public shell, its intellectual property, and the current capitalization of STW.  This amount has not been verified by an independent financial analyst, and is merely based on the Debtor's estimate of the value of the Debtor's assets and of the book value of STW based on its September 30, 2009 financial reports.  Additionally, although Old STW has an accumulated deficit, there is still positive shareholder equity, and the Reorganized Debtor plans additional capital raises.  Moreover, Old STW has also entered into several agreements that should bring revenue within the next six months.
While this cannot be guaranteed, Old STW and the Debtor believe there is a high probability of success.

794886-16

Ballots for acceptance or rejection of the Plan are being provided to Creditors in the Class of Claims entitled to vote to accept or reject the Plan. Each Holder of a Noteholder Claim and/or a General Unsecured Claim should read this Disclosure Statement and the Plan. If you are entitled to vote, after carefully considering this Disclosure Statement and the Plan, please indicate your vote with respect to the Plan on the enclosed ballot and return such ballot before the voting deadline to **Olshan Grundman Frome Rosenzweig & Wolosky, Park Avenue Tower, 65 East 55th Street, New York, NY 10022, attn: Suhailah Sallie**. If you are asserting more than one Claim, please copy your ballot and return one completed ballot for each Claim.

You should complete and sign the enclosed ballot and return such ballot in the envelope provided. In order to be counted, your ballot must be **actually received** by **Olshan Grundman Frome Rosenzweig & Wolosky, Park Avenue Tower, 65 East 55th Street, New York, NY 10022**, **attn: Suhailah Sallie** on or **before 5:00 p.m. (prevailing Eastern Time) on _____, 2010** (the "Voting Deadline"). All forms of personal delivery of ballots including overnight delivery service, courier service, and delivery by hand are acceptable. **Facsimile and electronic transmissions are acceptable as well.** There is no need to file your Ballot with the Clerk of the Bankruptcy Court. If your ballot is damaged or lost, or if you do not receive a ballot to which you are entitled, you may request in writing a replacement by contacting **Olshan Grundman Frome Rosenzweig & Wolosky, attn: Suhailah Sallie** at the stated address.

Only actual votes will be counted. A failure to return a ballot will not be counted either as a vote for or against the Plan. Any improperly completed or late ballot will not be counted. Any ballot that indicates both an acceptance and rejection of the Plan will be deemed a vote to accept the Plan. If no votes to accept or reject the Plan are received with respect to a particular class, the class will be deemed to have voted to accept the Plan. If a creditor casts

4

more than one ballot voting the same Claim before the Voting Deadline, the latest dated Ballot received before the Voting Deadline will be deemed to reflect the voter's intent and thus to supersede any prior ballots.  Creditors must vote all of their Claims within a particular Class under the Plan either to accept or reject the Plan and may not split their votes within a particular Class; thus, a ballot (or a group of ballots) within a particular Class received from a single Creditor that partially rejects and partially accepts the Plan will be deemed to have voted to accept the Plan.

1.3.    **Disclosure Statement Enclosures.**  Accompanying this Disclosure Statement are copies of: the Plan (Exhibit A); the liquidation analysis prepared by the Debtor (Exhibit B); and the Court's order approving this Disclosure Statement (Exhibit C); and a list of the Reorganized Debtor's proposed board of directors and officers as of the date of this Disclosure Statement (Exhibit D).  In addition, those parties eligible to vote will receive a ballot for voting on the Plan.

1.4.    **Confirmation Of The Plan.**  Your vote on the Plan is important.  In order for the Plan to be accepted, of those Holders of Claims who cast ballots, the affirmative vote of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Claims in each class is required.

If certain Classes vote against the Plan, the Bankruptcy Court may still confirm the Plan if the Court finds that the Plan does not unfairly discriminate against the impaired Class or Classes voting against the Plan and accords fair and equitable treatment to those impaired Classes.  The Plan Proponents intend to request such a "cramdown" confirmation if any Class does not vote in favor of the Plan.

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan for **10:00 a.m. (prevailing Eastern Time) on January 20, 2010 at the United States Bankruptcy Court for the Southern District of New York, Old Custom House, One Bowling Green, New**

794886-16

**York, New York.** Any party in interest may object to confirmation of the Plan. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan, be served upon: (i) counsel to the Debtor, Olshan Grundman Frome Rosenzweig & Wolosky, Park Avenue Tower, 65 East 55th Street, New York, NY 10022, attn: Andrea Fischer, Esq.; (ii) counsel to the DIP Lender, Rattet, Pasternak & Gordon-Oliver LLP, 550 Mamaroneck Avenue, Suite 510, Harrison, NY 10528, attn: Jonathan Pasternak, Esq., (iii) counsel to STW, Law Offices of Stephen M. Fleming, PLLC, 49 Front Street, Suite 206, Rockville Centre, New York 11570, attn: Stephen M. Fleming, Esq., (iv) the Office of the United States Trustee, 33 Whitehall Street, New York, New York 10004 and (v) the SECs, 3 World Financial Center, New York, NY 10281, attn: Alan S. Mazza, at or before 5:00 p.m. (prevailing Eastern Time) on **January 18, 2010**, in the manner described in the order scheduling hearing on confirmation accompanying the Disclosure Statement. **The Confirmation Hearing may be adjourned from time to time without further notice other than by announcement in open court**.

1.5.    **Recommendations With Respect To The Plan.**    The Plan Proponents recommend that you accept the Plan by voting your ballot accordingly and timely returning your completed ballot in the pre-printed envelope provided.

1.6.    **Disclaimer**.    The Bankruptcy Court's approval of this Disclosure Statement does not constitute either a guaranty of the accuracy of the information contained herein or an endorsement of the Plan by the Bankruptcy Court. This Disclosure Statement is the only document authorized by the Bankruptcy Court to be used in connection with the solicitation of votes accepting the Plan. No representations other than those explicitly set forth in this Disclosure Statement are authorized concerning the Debtor, including the value of its assets or the Claims of its creditors. The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

794886-16

This Disclosure Statement contains summaries of certain provisions of the Plan, certain statutory provisions, certain documents related to the Plan, certain events in the case and certain financial information. Although the Plan Proponents believe that the Disclosure Statement and related document summaries are fair and accurate, these documents are qualified to the extent that they do not set forth the entire text of the Plan, the document referred to or the statutory provision referred to. The terms of the Plan govern in the event of any inconsistency between it and this Disclosure Statement. All exhibits to the Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if set forth in full herein. The statements contained in this Disclosure Statement are made as of the date hereof, unless otherwise specified, and the Plan Proponents disclaim any obligation to update any such statements after the hearing on the approval of the Disclosure Statement.

**Safe harbor statement under the Private Securities Litigation Reform Act of 1995:**

**All forward-looking statements contained herein or otherwise made by the Debtor or Plan Proponents involve material risks and uncertainties and are subject to change based on numerous factors, including factors that are beyond the Debtor's or Plan Proponents' control. Accordingly, the Debtor's or Reorganized Debtor's future performance and financial results may differ materially from those expressed or implied in any such forward-looking statements. Such factors include, but are not limited to, those described in this Disclosure Statement. The Debtor does not undertake to publicly update or revise its forward-looking statements even if experience or future changes make it clear that any projected results expressed or implied therein will not be realized.**

**This Disclosure Statement has been prepared pursuant to Section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and not**

7

794886-16

**prepared necessarily in accordance with federal or state securities laws or other similar laws. The offer of Reorganized Debtor Reorganized Debtor Common Stock and Reorganized Debtor Convertible Preferred Stock (as defined in the Plan) made hereunder has not been registered under the Securities Act or similar state securities or "blue sky" laws. The issuance and distribution of Reorganized Debtor Reorganized Debtor Common Stock and Reorganized Debtor Convertible Preferred Stock to creditors of the Debtor pursuant to the Plan are being made in reliance on the exemption from registration specified in Section 1145 of the Bankruptcy Code. None of the stock to be issued on the Effective Date has been approved or disapproved by the SEC or by any state securities commission or similar public, governmental, or regulatory authority, and neither the SEC nor any such state authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or upon the merits of the Plan. Persons or entities trading in or otherwise purchasing, selling or transferring securities of the Debtor should evaluate this Disclosure Statement and the Plan in light of the purposes for which they were prepared.**

The financial information contained herein has been prepared by the Debtor and has not been audited by a certified public accountant and has not necessarily been prepared in accordance with generally accepted accounting principles. The DIP Lender has not independently verified this financial information and is relying on the Debtor's disclosures.

All parties in interest are encouraged to read the entire Disclosure Statement carefully, including the Plan and other exhibits, before deciding to vote either to accept or reject the Plan. Holders of Claims should not, however, construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice and should consult with their own advisors.

8

794886-16

## ARTICLE II
## DEBTOR'S HISTORY AND BUSINESS BACKGROUND

2.1.    **Business Description**

The Debtor was organized on September 11, 2003, under the laws of the State of Nevada, as GPP Diversified, Inc ("GPP").  GPP's business was selling pet products online.  On November 9, 2005, GPP changed its name from GPP to Pet Express Supply, Inc. ("Pet Express").  On July 28, 2008, Pet Express entered into an exchange agreement with the shareholders of CJ Vision Enterprises, Inc. ("CJ Vision"), which was doing business as Woozyfly.com.  Pursuant to the exchange agreement, among other things, CJ Vision became a wholly-owned subsidiary of Pet Express, Pet Express succeeded to CJ Vision's business as its sole business, and Pet Express changed its name to WoozyFly Inc.

Woozyfly's business was an online music and entertainment media company devoted to independent music and talent discovery, fan interaction and social networking and user-generated content.

On January 14, 2009, the Debtor's then sole director resigned and the Company appointed new directors and officers, including Eric Stoppenhagen, who had been acting as a consultant to the Company since January 2009.  Mr. Stoppenhagen is the interim president of the Debtor, acting on a consultant basis.

2.2.    **Circumstances Leading to Chapter 11**

On January 25, 2009, Woozyfly ceased operations entirely.  Since that time, the Debtor had been seeking to restructure the Company's capitalization and to enter into a business combination with a private company.  Thus far, the Debtor has been unsuccessful in its attempt.

Since its attempts to restructure a business combination have not yielded any results, the Debtor subsequently has been seeking to sell itself as a shell company.  To date, the only party that has expressed interest is the DIP Lender. The DIP Lender is owed an aggregate of

$650,000 with respect to the Convertible Notes (as defined below) secured by liens on substantially all of the Debtor's assets.

On March 30, 2009, the DIP Lender lent the Debtor an additional $35,000 to allow it to file for bankruptcy protection in order that the Debtor could effectuate a sale of its stock under a chapter 11 plan of reorganization.  The DIP Lender has lent an additional $65,000 to the Debtor post-petition in order to allow the Debtor to pay the administrative costs of this bankruptcy case up through and including confirmation of an agreed plan of reorganization (the "DIP Loan").  Thus, the DIP Lender is owed $100,000, above its debt on the Convertible Notes, on account of its DIP Claim.

Against this backdrop, the Debtor acknowledged its limited opportunities and filed for Chapter 11 in order to maximize value for its stakeholders by allowing certain existing stakeholders to receive stock in the reorganized debtor.

2.3.    **Capital and Financial Structure.**  Woozyfly is a public company, traded as a penny stock on the OTC Bulletin Board under the trading symbol "WZYF".

(i)    **Pre-Petition Secured Debt**

Convertible Notes

On July 25, 2008, Woozyfly entered into a Loan and Security Agreement (the "Loan Agreement") providing for the issuance of 6% Convertible Notes due June 30, 2011 ("Convertible Notes").  Pursuant to the Loan Agreement an aggregate principal amount of $1,400,000 of Convertible Notes were issued.  The entire principal amount under the Convertible Notes plus all accrued and unpaid interest is due on June 30, 2011.  Interest is payable on the last day of each calendar quarter, commencing September 30, 2008.

In connection with the issuance of the Convertible Notes, the Debtor granted to the investors five-year warrants to purchase an aggregate of 1,602,066 shares of common stock of

10

Woozyfly Inc. at $0.75 per share. The Debtor valued these warrants at zero. The warrants contain cashless exercise provisions that enable the holder to exercise the warrants without paying additional consideration and to receive a reduced number of shares in accordance with a formula set forth in the warrant.

The Debtor used the funds received under the Convertible Notes for working capital and general corporate purposes.  The DIP Lender is a holder of Convertible Notes in the principal amount of $650,000 (out of $1.4 million sold).

Exchange Notes

Pursuant to the Exchange Agreement, the Debtor issued to two accredited investors an aggregate principal amount of $297,504.00 of 6% Promissory Notes due June 30, 2009 ("Exchange Notes"), in exchange for convertible notes in the same principal amount originally issued by C. J. Vision, the Debtor's wholly-owned subsidiary.  The principal and accrued interest on the Exchange Notes were payable on the maturity date, June 30, 2009.

### ARTICLE III
### SIGNIFICANT EVENTS DURING THE BANKRUPTCY

3.1.    **Voluntary Petition.**  On May 12, 2009, Woozyfly filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. in the United States Bankruptcy Court for the Southern District of New York.  The Debtor continues operating its business and managing its properties as debtor in possession pursuant to Bankruptcy Code Sections 1107 and 1108.  No trustee, examiner or committee has been appointed in the Debtor's Chapter 11 case.  The Debtor has filed the requisite schedules of assets and liabilities and statements required pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007.  The Debtor anticipates payment in full of all U.S. Trustee Fees as those fees come due in the ordinary course.

11

3.2.   **Employment of Professionals**.  The Court has authorized the Debtor to employ Olshan Grundman Frome Rosenzweig & Wolosky as its bankruptcy counsel.

3.3.   **Claims Bar Date**.  Pursuant to Bankruptcy Rule 3003 and Local Bankruptcy Rule 3003-1, the Bankruptcy Court established September 8, 2009 (the "Bar Date") as the deadline by which all Creditors holding a Claim against the Debtor which arose prior to the filing of the Case, and which was not listed by the Debtor on its schedules, or listed on the schedules as disputed, contingent, or in an unliquidated amount, were required to file a proof of claim with the Bankruptcy Court.  Notice of the Bar Date was timely mailed to all parties on the Court's Master Mailing Matrix.  Persons required to file a proof of claim by the Bar Date, but who did not do so, will not receive any distribution under the Plan.  The Bar Date also applies to Administrative Expense Claims except for those pertaining to professional fees and expenses.

3.4.   **Debtor in Possession Financing**.  The Bankruptcy Court has entered an interim order permitting the Debtor to use a portion of the DIP Loan to pay the administrative costs of the bankruptcy case.  Under the terms of the DIP Loan, pursuant to Bankruptcy Code § 364(c) and (d), the DIP Lender's Claim is secured by a first priority lien on all of the Debtor's assets and has super priority Administrative Expense Claim status, junior only to U.S. Trustee Fees.

**ARTICLE IV**
**FINANCIAL STATUS**

4.1.   **Debtor's Liabilities.**  The Debtor estimates that, as of the Effective Date, their pre-petition and post-petition liabilities will consist of the following:  Pre-petition debts consist of known priority tax claims of approximately $5,000, Noteholder Claims of approximately $1.7 million (including interest and other charges) and General Unsecured Claims of approximately $108,000.  The Debtor estimates that its post-petition liabilities will consist of the DIP Claim of $100,000 plus accrued interest, which will be used to fund Administrative Expense Claims for Chapter 11 professional fees and expenses not to exceed $100,000.  It is possible that prior to the

12

Effective Date, the Debtor will have paid part of the administrative professional fees and expenses, which payments will reduce the amount of the Debtor's liabilities.

      4.2.   **Debtor's Assets**.     The Debtor has few, if any, assets currently. The Debtor estimates that on the Effective Date, its assets will consist of (i) its public corporate shell, the value of which is estimated to be approximately $200,000, if it were to be sold on the open market and (ii) intellectual property, valued at approximately $20,000.  On the Effective Date, Old STW will merge into a newly formed subsidiary of the Reorganized Debtor, such that the Reorganized Debtor will be capitalized with the Old STW assets, having a book value of approximately $1,718,819, as per Old STW's September 30, 2009 financial report.  Although Old STW currently has an accumulated deficit, it still has positive shareholder equity.  In addition, once the plan is confirmed, the Reorganized Debtor plans additional capital raises.  Moreover, Old STW has also entered into several agreements that should bring revenue within the next six months.  Moreover, Old STW has also entered into several agreements that should bring revenue within the next six months.  While this cannot be guaranteed, Old STW and the Debtor believe there is a high probability of success.

**ARTICLE V**
**<u>THE PROPOSED MERGER</u>**

      5.1.   **Introduction**.

      The Plan provides for the merger of Old STW with and into a newly formed wholly owned subsidiary of the Reorganized Debtor on the Effective Date in what is typically referred to as a reverse merger, thereby preserving the public entity nature of the Debtor for the benefit of the Reorganized Debtor and the Merger Parties.  The Plan Proponents are hopeful that the merger will result in an active and viable public trading market for the shares of the Reorganized Debtor, but make no representations or warranties that such market will develop at any time or at any price.  The Reorganized Debtor will be known as STW Global, Inc.  The

13

individuals comprising the Reorganized Debtor's initial board of directors and officers are listed in Exhibit D to the Plan.

After the Effective Date, the Reorganized Debtor will be recapitalized with an infusion of Old STW's current assets. Moreover, the Reorganized Debtor contemplates raising additional capital through additional equity raises, which shall be accomplished pursuant to the applicable provisions of the Securities Act or any applicable exemptions thereunder.

The documents effecting the Merger will be filed with the Court as part of the Plan Supplement.

5.2. **Old STW.**

Old STW, based in Houston, Texas, provides customized water reclamation services. Its principal operations are in Pennsylvania and Texas. Old STW's core expertise is an understanding of water chemistry and its application to the analysis and remediation of complex water reclamation issues. Old STW provides a complete solution throughout all phases of a water reclamation project including analysis, design, evaluation, implementation and operations. Management's training and experience provides Old STW with a richer understanding of the customer's overall perspective.

The gas industry, in its current state, specifically gas producers operating in the Northeast United States, use a recently developed a frac technique in which it introduces millions of gallons of water into shale formations in order to extract gas. A large portion of the water resurfaces in a contaminated format and is then introduced back into the environment in its polluted form. Old STW provides gas producers with the needed services to manage, recover and return water to the environment in a "green" manner in its pure form thereby protecting local residents and the agriculture industry from contaminated water and preserving the eco-system. Further, Old STW is refining the process to provide gas providers a business model in which

14

contaminated water is extracted from local, abandon coal mines is then reclaimed, purified and utilized in fracing. The gas producers are drawn to this model as they will no longer need to go through the arduous and expensive process of obtaining the needed state permits to utilize water.

Most recently, Old STW has received a signed endorsement from the Secretary of the Department of Environmental Protection and the Secretary of Economic Development in the state of Pennsylvania. This letter acknowledges the technologies that Old STW has presented as a solution to the Marcellus water management issues in light of the fact that gas producers will be required to reclaim the water they utilize starting  January 2011.  Specifically, this new law will prohibit the disposal of high TDS (salts) in rivers.

Old STW's expertise is applicable to several market segments including:

(i)      gas shale hydro-fracturing flowback;

(ii)     oil and gas produced water;

(iii)     acid mine drainage ("AMD");

(iv)     desalination;

(v)      brackish water; and

(vi)     municipal waste water.

The primary focus of Old STW's marketing efforts are the gas shale plays particularly the Marcellus, AMD in the Appalachians, steam and water floods in the San Joaquin Valley oil fields in California, and brackish water in Texas.

Understanding water chemistry is the foundation of Old STW's expertise. Old STW will provide detailed chemical analysis of the input stream and of the process output that conforms to the various environmental and legal requirements. Old STW becomes an integral part of the water management process and provides a customized solution that encompasses analysis, design and operations including pretreatment and transportation.  Simultaneously, the company

15

evaluates the economic impact of this process to the customer. These processes will use technologies that fit our customer's needs: fixed, mobile or portable; evaporation, reverse-osmosis or membrane technology; and any necessary pre-treatment, crystallization and post-treatment. Old STW will also supervise construction, testing, and operation of these systems. Our keystone is determining and optimizing the most appropriate technology to effectively and economically address our customers' particular requirements.

### **Current Market Opportunities**

Gas shale fracturing flowback water:

Old STW is actively pursuing opportunities in all the major shale formations in the United States. The initial focus, in this sector, is the Marcellus Shale in Pennsylvania. This shale has the potential to be the largest and most productive natural gas field in the United States. Presently there are about 800 producing wells, the majority being simple vertical wells, and over sixty new wells in Pennsylvania are being drilled each month. Most of the new wells being drilled are horizontal, requiring about 3.5 million gallons of water per well. Over the next ten years, Old STW estimates that over 12,000 wells will be completed producing gas volumes of 12 billion cubic feet annually, utilizing over 42 billion gallons of water, and generating over 400 million barrels (one barrel = 42 gallons) of water for disposal or reclamation. There are 28 producers in the Marcellus, with the four largest being Range Resources, Chesapeake Energy, Atlas Energy Resources and Seneca Resources. Old STW is currently in various stages of negotiations with all of these.

Acid mine drainage (AMD):

AMD is another sensitive environmental issue in the Appalachian Mountain regions. It has impaired more than 4,600 miles of waterways in Pennsylvania alone. Drainage from old abandoned coal mines is acidic, and insoluble metal oxides precipitate when the drainage enters

16

a river, lake or stream, damaging the marine ecosystem. The AMD discharge from a single mine or coal tailing pile can range from 10 to more than 10,000 gallons per minute. In just one example, the Lackawanna River in northeastern Pennsylvania is being contaminated from at least seven monitored AMD locations with estimated peak flow of 40 million gallons per day. Old STW has identified the state of Pennsylvania as a customer for AMD purification and the Marcellus producers (*e.g.* Range Resources, Chesapeake Energy, Atlas Energy Resources and Seneca Resources) as potential customers for the resultant reclaimed water.

**Management**

The Old STW is led by a senior management team with extensive industry experience, in the water management process. The team has excellent knowledge of all aspects of the reclamation cycle from chemistry to disposal issues, and applies this to design customized solutions for our customer's requirements. Below is a description of Old STW's current principal executive officers, who anticipate continuing with the Reorganized Debtor after the merger:

**GENE BROCK**

President and Chief Executive Officer

Gene Brock, a 37 year veteran of the oilfield chemical market, providing unique solutions to well failures, oil water separation, scale prevention, wax control, and surfactants. Prior to joining Old STW Resources, Mr. Brock served as the Vice President for Technology for BJ Chemical Services. Prior to his 14 years with BJ Chemical Services, he began his career at Arco Chemical Old STW as a manager for Technical Services and Quality, was Vice President for Manufacturing and Technology for Sooner Chemicals, and was Manager for Engineering Services for Betz Energy Chemicals. Mr. Brock has studied the water chemistry from wells all

17

over the US for the last few years and has identified correct and cost effective means to reclaim the water.

### MARTY WALTER

Vice President of Field Operations

Marty Walter has 25 years of experience in the specialty chemical, petrochemical, and cryogenics industries in the areas of operations, safety, environmental, customer service and logistics. Prior to joining Old STW Resources, Mr. Walter was the Operations Manager for NuCo2,Inc. Prior to that, he was a manager for Distribution and Office Services for Betz Energy Chemicals, and Assistant Plant Manager for Betz Laboratories.

### WADE STUBBLEFIELD

Chief Financial Officer

Mr. Stubblefield has 20 years of finance and accounting experience. Mr. Stubblefield began his career in public accounting at Arthur Andersen LLP and has subsequently held controllership and CFO positions in companies ranging in size from small-cap oil and gas exploration and production companies to multi-billion dollar NYSE-listed enterprises. Mr. Stubblefield holds a Bachelor of Business Administration degree with a concentration in Accounting, from Texas A&M University, awarded in 1988. He is a Certified Public Accountant.

Following the merger, the Reorganized Debtor will continue to develop its offered services and will increase its business development and marketing activities, levering off of recent successes and increased visibility and aggressively seeking new opportunities. The management team includes veteran business development, marketing, chemical field, and finance professionals to lead the Reorganized Debtor to develop a detailed operating plan to

18

794886-16

drive top line revenue and manage operating expenses in accordance with the projections

attached hereto as Exhibit E.

The Debtor has no known connection to Old STW.

## ARTICLE VI
## DESCRIPTION OF THE PLAN

6.1.    **Introduction.**  This section summarizes the important provisions of the Plan.  The

Plan is annexed to this Disclosure Statement as Exhibit A.  Parties are encouraged to review the

Plan in its entirety for a full understanding of its provisions and impact on creditors.

The Plan provides that all Claims are placed into the Classes set forth below,

except that pursuant to Bankruptcy Code §1123(a)(1), Administrative Expense Claims and

Priority Tax Claims are not classified.

Under the Plan, unclassified Claims are not impaired.  Holders of an

Administrative Expense Claim, Priority Tax Claim and Unclassified Claims are conclusively

presumed to have accepted the Plan and, therefore, are not entitled to vote to accept or reject the

Plan.

Holders of Claims in the following Classes are entitled to vote to accept or reject

the Plan: Class 3 (Noteholder Claims) and Class 4 (General Unsecured Claims). Holders of Class

5 (Interests in the Debtor) receive no distribution under the Plan and are conclusively presumed

to have rejected the Plan and are not entitled to vote.

6.2.    **Treatment of Unclassified Claims.**    The Plan provides for the following

treatment of Unclassified Claims:

**Administrative Expense Claims**.  All Administrative Expense Claims, if any,

shall be paid in full in cash as soon as practicable after the Effective Date.

**Bar Dates for Administrative Expense Claims**.  Holders of Administrative

Expense Claims other than retained professionals are subject to the above-described Bar Date.

794886-16

**DIP Claim.** The DIP Lender has agreed to reduce its own recovery on account of its DIP Claim to provide a distribution to General Unsecured Claims. Thus, the Holder of the DIP Claim will receive, in full satisfaction of its Claim, the DIP Claim Distribution less the General Unsecured Claims Distribution, resulting in a distribution of 8.24% of the Reorganized Debtor Reorganized Debtor Common Stock and Reorganized Debtor Convertible Preferred Stock. The Reorganized Debtor Stock Creditor Distribution shall be exempt from all registration requirements pursuant to Bankruptcy Code § 1145.

**Applications for Professional Fees.** All applications for professional fees for services rendered and reimbursement of expenses in connection with the Bankruptcy Case prior to the Effective Date are Administrative Expense Claims and shall be filed with the Bankruptcy Court within sixty (60) days after the Effective Date. Any such application not filed within sixty (60) days after the Effective Date shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. All such professional fees incurred by the Debtor in its Case will be paid by the Reorganized Debtor from the proceeds of the DIP Loan.

**U.S. Trustee Fees.** All unpaid U.S. Trustee Fees incurred before the Effective Date shall be timely paid by the Debtor in the ordinary course as such U.S. Trustee Fees become due and payable. All unpaid U.S. Trustee Fees incurred after the Effective Date shall be timely paid by the Reorganized Debtor from Post-Confirmation Assets in the ordinary course as such U.S. Trustee Fees become due and payable.

**Allowed Priority Tax Claims.** Allowed Priority Tax Claims shall be paid in full from Post-Confirmation Assets as soon as practicable after the Effective Date.

6.3. **Treatment of Classified Claims**. The Plan provides for the following treatment of Claims in the following Classes:

794886-16

**Class 1 (Non-Tax Priority Claims).**  INTENTIONALLY OMITTED

**Class 2 (Secured Claim).**   INTENTIONALLY OMITTED

**Class 3 (Noteholder Claims).**  The Holders of Allowed Noteholder Claims shall receive in full satisfaction thereof their *pro rata* share of the Noteholder Distribution.  As noted above, 1,760,000 shares of the Reorganized Debtor Reorganized Debtor Common Stock shall be distributed *pro rata* among all Class 3 Noteholder Claims.  This Distribution shall be exempt from all registration requirements pursuant to Bankruptcy Code § 1145.

**Class 4 (General Unsecured Claims).**  The Holders of Allowed General Unsecured Claims shall receive in full satisfaction thereof their *pro rata* share of the General Unsecured Claims Distribution.  As noted above, 0.32% of the Reorganized Debtor Reorganized Debtor Common Stock is to be distributed *pro rata* among all Class 4 General Unsecured Claims.  This Distribution shall be exempt from all registration requirements pursuant to Bankruptcy Code § 1145.

**Class 5 (Interests).**   On the Effective Date, the Debtor's equity interest shall be extinguished and canceled.  Pursuant to the absolute priority requirements of §1129(b)(2) of the Code, the holders of Class 5 Interests will receive no distribution under the Plan and are deemed to have rejected the Plan.

**Reservation of Rights.**  Except as otherwise provided in the Plan or the Confirmation Order, the Debtor's or Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Claims or Administrative Expense Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments, shall be unaffected and unaltered.  From and after the Effective Date, the Reorganized Debtor shall be deemed to be the successor in interest to the Debtor with respect to all such rights and defenses.

794886-16

**Classes Entitled to Vote.** Holders of Claims in Class 3 and Class 4 shall be entitled to vote to accept or reject the Plan.

**Acceptance by Impaired Classes of Claims.** An Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under Bankruptcy Code § 1126(e)) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders (other than any Holder designated under Bankruptcy Code § 1126(e)) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

**Cramdown.** If an Impaired Class of Claims does not accept the Plan, the Plan Proponents request Confirmation of the Plan under Bankruptcy Code § 1129(b). The Plan Proponents reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to Bankruptcy Code § 1129(b) requires modification or for any other reason in their discretion.

6.4. **Conditions Precedent to the Effective Date.** Each of the following events shall occur on or before the Effective Date:

(a) The Merger Parties will have obtained all necessary government approvals, and filed all necessary documents or reports with the SEC to consummate the Merger;

(b) The Merger Documents will be in a form satisfactory to each Merger Party and have been fully executed by the Merger Parties;

(c) The Final Confirmation Order shall have been entered, in a form and substance reasonably acceptable to each of the Plan Proponents and which shall include one or more findings that (i) the Plan was proposed in good faith by the Plan Proponents, (ii) the Plan satisfied the applicable provisions of the Bankruptcy Code as set forth in Bankruptcy Code § 1125(e), and (iii) the Reorganized Debtor is a successor to the

794886-16

Debtor only to the limited extent necessary to comply with Bankruptcy Code § 1145 and for no other reason under any state or federal law;

(d) The Debtor shall be in full compliance with and all state and federal (including SEC) tax and securities laws and regulations;

(e) The Debtor shall be current on all state and federal (including SEC) tax and securities filing requirements, including all required tax returns and audits;

(f) The Bankruptcy Court shall have determined that the Reorganized Debtor is duly authorized to take the actions contemplated in the Plan which approval and authorization may be set forth in the Confirmation Order; and

(g) All documents, instruments, and agreements provided under, or necessary to implement the Plan shall have been executed and delivered by the applicable parties.

*Waiver of Conditions Precedent to the Effective Date.* The Plan Proponents may waive in writing any or all of the conditions precedent to the Effective Date set forth in this Article, whereupon the Effective Date shall occur without further action by any Person; provided, however, that the conditions specified in Article 6.4 (c) may not be waived.

6.5.    **Merger.** On the Effective Date, Old STW, along with its assets and business, shall merge with and into a newly formed wholly owned subsidiary of the Reorganized Debtor. The Reorganized Debtor shall be a company reporting under the Securities Exchange Act of 1934, as amended, known as STW Global, Inc.

6.6.    **Certificate of Incorporation and By-Laws of Reorganized Debtor, Directors and Corporate Action**.

(a) Certificate *of Incorporation and By-Laws*.  On the Effective Date (or as soon as reasonably practicable thereafter), the Reorganized Debtor shall file its amended certificate of incorporation and by-laws (which shall be filed with the Bankruptcy

23

Court as part of the Plan Supplement). The amended certificate of incorporation shall satisfy the provisions of the Plan and the Bankruptcy Code. After the Effective Date, the Reorganized Debtor may amend and restate the amended certificate of incorporation and by-laws as permitted by applicable law.

(b) *Directors and Officers of the Reorganized Debtor.* On the Effective Date, the members of the Debtor's board of directors and officers will resign, and the board of directors and officers of the Reorganized Debtor shall consist of the individuals listed in Exhibit D to the Plan.

6.7.    **Cancellation of Instruments and Stock.** On the Effective Date, all Interests in the Debtor, any and all stock options (including, but not limited to, all stock options granted to the Debtor's employees), any and all warrants and any instrument evidencing or creating any indebtedness or obligation of the Debtor, except such instruments that are issued under the Plan, shall be canceled and extinguished. Additionally, as of the Effective Date, all Interests in the Debtor, and any and all warrants, options, rights or interests with respect to equity interest in the Debtor that have been authorized to be issued but that have not been issued shall be deemed canceled and extinguished without any further action of any party.

6.8.    **Issuance of Reorganized Debtor Reorganized Debtor Common Stock and Reorganized Debtor Convertible Preferred Stock.** On the Effective Date, the Reorganized Debtor shall issue shares of Reorganized Debtor Reorganized Debtor Common Stock and Reorganized Debtor Convertible Preferred Stock in an amount necessary to satisfy the Debtor's obligations under Article V of the Plan. The New Reorganized Debtor Convertible Preferred shall be convertible on a one for one basis with Reorganized Debtor Common Stock and shall have the attributes as set forth in Exhibit A. The Reorganized Debtor shall issue shares as follows:

24

- Noteholders
  1,760,000 shares of Reorganized Debtor Common Stock

- DIP Lender
  500,000 shares[4] of Reorganized Debtor Common Stock and 2,140,000 shares of Reorganized Debtor Reorganized Convertible Preferred Stock

- Old STW Shareholders
  26,443,075 shares of Reorganized Debtor Common Stock

It is an integral and essential element of the plan that the issuance of the Reorganized Debtor Reorganized Debtor Common Stock and Reorganized Debtor Reorganized Debtor Convertible Preferred Stock to the DIP Lender and Allowed Claim Holders, pursuant to Article V of the Plan, shall be exempt from registration under the Securities Act and any state or local law, pursuant to Bankruptcy Code § 1145.  The Confirmation Order shall include a finding and conclusion, binding upon all parties to the Case, the Debtor, the Reorganized Debtor, the Merger Parties, the SEC and all other federal, state and local regulatory enforcement agencies, to the effect that such offer and issuance fall within the exemption(s) from registration under the Securities Act and any state of local law pursuant to Bankruptcy Code § 1145.  Any Reorganized Debtor Reorganized Debtor Common Stock authorized but not issued pursuant to the Plan shall be retained in treasury by the Reorganized Debtor and available for subsequent sale or distribution in accordance with the Securities Act and/or any state of local law, and any applicable regulations relating thereto.

    6.9.    **Continuation of the Debtor and Reorganized Debtor:**    The Reorganized Debtor shall act as disbursing agent.  The Reorganized Debtor shall be responsible for: (a) paying, objecting to, settling and administering Administrative Expense Claims and Priority Claims; (b) paying, objecting to, settling and administering Class 3 and Class 4 Claims; (c)

---

[4] 100,000 of these shares shall be provided by the DIP Lender to the General Unsecured Creditors holding Allowed Claims.

794886-16

paying U.S. Trustee Fees after the Effective Date; and (d) performing normal wind-up administrative activities and functions for the Post-Confirmation Assets.

*(a) Creation of Reserve for Expenses and Professional Fees.* To the extent necessary to pay the anticipated awards of fees of the professionals retained by the Debtor in its Case and to pay the post-Effective Date expenses of the Debtor, before making the Distributions, the Reorganized Debtor shall create a reserve sufficient to fund all such payments.

6.10. **Dissolution of C.J. Vision Enterprises, Inc.** Pursuant to a resolution of the Board of Directors and approval of the majority of the stockholders entitled to vote of C.J. Vision, on the Effective Date, C.J. Vision Enterprises, Inc., a Delaware corporation and the Debtor's wholly-owned subsidiary, will be dissolved pursuant to 8 Del. C. § 275. In accordance with applicable, law, a certificate of dissolution will be filed with the Secretary of State of Delaware.

6.11. **Settlement of Disputed Claims Prior to the Effective Date.** At any time prior to the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtor may settle some or all Disputed Claims subject to obtaining any necessary Bankruptcy Court approval.

6.12. **Operating Reports.** Prior to the Effective Date, the Debtor shall timely file all reports, including without limitation, monthly operating reports, required by the Bankruptcy Court, Bankruptcy Code, Bankruptcy Rules or Office of the United States Trustee. After the Effective Date, the Reorganized Debtor shall timely file all reports, including without limitation, quarterly operating reports, as required by the Bankruptcy Court, Bankruptcy Code, Bankruptcy Rules or Office of the United States Trustee.

6.13. **Distributions.** The Plan includes the following provisions to govern Distributions under the Plan by the Reorganized Debtor:

794886-16

(a)    *Distributions for Claims Allowed as of the Effective Date*.    Except as otherwise provided herein or as ordered by the Bankruptcy Court, Distributions to Creditors for Allowed Claims shall be made as soon as practicable after the Effective Date.    Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made as soon as reasonably practicable after such Claim becomes an Allowed Claim.

(b)    *Means of Cash Payment*.    Cash payments made pursuant to the Plan shall be in U.S. funds, by the means, including by check or wire transfer, determined by the Reorganized Debtor.

(c)    *Delivery of Distribution*.    Distributions to holders of Allowed Claims shall be made (a) at the addresses set forth on the Proofs of Claim Filed by such holders (or at the last known addresses of such holders if no Proof of Claim is Filed or if the Debtor has been notified of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtor; or (c) if no Proof of Claim has been Filed and the Reorganized Debtor has not received a written notice of a change of address, at the addresses reflected in the Bankruptcy Schedules, if any.

(d)    *Objection Deadline; Prosecution of Objections; Late Filed Claims Expunged*. As soon as reasonably practicable, the Reorganized Debtor shall File objections to Claims and serve such objections upon the holders of each of the Claims to which objections are made.    All late filed Claims (those filed after the Bar Date) are deemed expunged absent further order of this Court allowing same.    The Reorganized Debtor shall be authorized to resolve all Disputed Claims by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having competent jurisdiction the validity, nature, and/or amount thereof.    If the Reorganized Debtor and the holder of a Disputed Claim agree to compromise, settle, and/or resolve a Disputed Claim by granting such holder an Allowed Claim

27

in the amount of $10,000 or less, then the Reorganized Debtor may compromise, settle, and/or resolve such Disputed Claim without further Bankruptcy Court approval. Otherwise, the Reorganized Debtor may only compromise, settle, and/or resolve such Disputed Claim with Bankruptcy Court approval.

(e) *No Distributions Pending Allowance.* Notwithstanding any other provision of the Plan, no payments or Distribution by the Reorganized Debtor shall be made with respect to all or any portion of a Disputed Claim in which the Reorganized Debtor has an interest unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

(f) *Withholding and Reporting Requirements.* In connection with the Plan and all Distributions hereunder, the Reorganized Debtor shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtor shall be authorized to take any and all actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements.

(g) *Setoffs.* The Reorganized Debtor may, but shall not be required to, setoff against any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor or the Reorganized Debtor, respectively, may have against the holder of such Claim; provided, however, neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such Claim that the Reorganized Debtor may have against such

28

794886-16

holder, unless otherwise agreed to in writing by such holder and the Reorganized Debtor, as applicable.

6.14.  **Effects of Confirmation.**  The Plan provides that Confirmation will have the following effects:

(a)      *Discharge.*  Except as otherwise set forth in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims including any interest accrued on any Claims from the Petition Date, and the termination of all Interests.  Confirmation shall (a) discharge the Debtor and the Reorganized Debtor from all Claims or other debts that arose before the Confirmation Date, and all debts of a kind specified in Bankruptcy Code §§ 502(g), (h), or (i), whether or not (i) a Proof of Claim based on such debt is Filed or deemed Filed under Bankruptcy Code § 501; (ii) a Claim based on such debt is Allowed; or (iii) the holder of a Claim based on such debt has accepted the Plan; and (b) terminate all Interests and other rights of Interests in the Debtor.

(b)      *Injunction.*  Except as otherwise expressly provided herein or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against or Interests in the Debtor, and all other parties in interest, along with their respective present and former employees, agents, officers, directors, principals and affiliates, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kin on any such Claim or Interest against the Debtor, the Reorganized Debtor or the DIP Lender, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or other against the Debtor, the Reorganized

29

Debtor or the DIP Lender, (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtor, the Reorganized Debtor or the DIP Lender or against the property or interests in property of the Debtor, the Reorganized Debtor or the DIP Lender, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the Debtor or against the property or interests in property of the Debtor, Reorganized Debtor or the DIP Lender with respect to such Claim or Interest or (e) pursuing any claim released pursuant to this Article IX of the Plan.  Such injunction shall extend to any successors of the Debtor and the Reorganized Debtor, and their respective properties and interests in properties.

(c)        *Exculpation and Limitation of Liability*.  Pursuant to and to the extent permitted by section 1125(e) of the Code, and notwithstanding any other provision of the Plan, no holder of a Claim or Interest shall have any right of action against the Debtor, the Reorganized Debtor, the Post-Confirmation Assets, the Plan Proponents or any of their respective managers, officers, directors, agents, attorneys, investment bankers, financial advisors, other professionals, or any of their respective property and assets for any act or omission in connection with, relating to or arising out of the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which constitute willful misconduct or gross negligence.

(d)        RELEASES.

ON THE EFFECTIVE DATE, THE DEBTOR, THE REORGANIZED DEBTOR AND THE PLAN PROPONENTS (COLLECTIVELY, THE "RELEASOR PARTIES") SHALL BE DEEMED TO HAVE RELEASED AND DISCHARGED TO THE FULLEST EXTENT POSSIBLE ALL PRESENT AND FORMER OFFICERS, DIRECTORS, AGENTS,

30

ATTORNEYS, INVESTMENT BANKERS, FINANCIAL ADVISORS, AND PROFESSIONALS EMPLOYED BY OR ASSOCIATED WITH THE RELEASOR PARTIES (THE "RELEASED PARTIES"), OF AND FROM ANY AND ALL CLAIMS OR CAUSE OF ACTIONS, WHETHER KNOWN OR UNKNOWN, ASSERTED OR NOT ASSERTED, SCHEDULED OR NOT SCHEDULED AND WHETHER ARISING UNDER THE BANKRUPTCY CODE OR OTHER APPLICABLE STATE OR FEDERAL LAW, ARISING FROM OR RELATED TO ACTS OR OMISSIONS (EXCEPT FOR GROSS NEGLIGENCE OR INTENTIONAL FRAUD) OCCURRING ON OR BEFORE THE EFFECTIVE DATE OF THE PLAN AND THE RELEASOR PARTIES COVENANT NOT TO SUE ANY OF THE RELEASED PARTIES WITH RESPECT TO THE CLAIMS RELEASED HEREIN.

Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, and/or Confirmation Order, no provision shall release any non-debtor, including any current and/or former officer and/or director of the Debtor and/or Plan Proponent, and any non-debtor, from liability in connection with any legal action or claim brought by the United States SEC.

*Legal Binding Effect.* The provisions of the Plan shall bind all holders of Claims and Interests and their respective successors and assigns, whether or not they accept the Plan.

6.15. **Insurance.** Confirmation and consummation of the Plan shall have no effect on insurance policies of the Debtor in which the Debtor is or was an insured party. Each insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to the Debtor's Bankruptcy Cases, the Plan or any provision within the Plan, including the treatment or means of liquidation set out within the Plan for insured Claims.

794886-16

6.16.    **Retention of Jurisdiction**.  The Plan provides that, pursuant to Bankruptcy Code §§ 105(a) and 1142, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a) allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any application or request for payment of any Administrative Expense Claim, and the resolution of any objections to the allowance or priority of Claims;

(b) hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all causes of action, and consider and act upon the compromise and settlement of any Claim, or cause of action;

(c) enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection therewith;

(d) hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan;

(e) consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(f) issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

794886-16

(g) hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, and the Confirmation Order;

(h) enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Case;

(i) hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code §§ 346, 505 and 1146;

(j) hear and determine all matters related to the Post-Confirmation Assets, the Debtor, and the Reorganized Debtor from and after the Effective Date;

(k) hear and determine such other matters as may be provided in the Confirmation Order and as may be authorized under the provisions of the Bankruptcy Code; and

(l) enter a final decree closing the Cases.

6.17.   **Miscellaneous Provisions of the Plan.**

(a) *Revocation, Withdrawal or Non-Consummation.*  Without limiting the application of Article 11.2 of the Plan, the Debtor, upon five (5) Business Days notice to the other, reserves the right to withdraw as a Plan Proponent prior to the Confirmation Hearing Date.  If the Plan is withdrawn or if Confirmation or Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) settlements or compromises embodied in the Plan, assumptions or rejections of executory contracts or unexpired leases affected by the Plan, and any documents or agreements executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtor, the DIP Lender or any other Person, or (iii) constitute an admission of any sort by the Debtor, the DIP Lender or any other Person.

794886-16

(b) *Severability of Plan Provisions*.    If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of either of the Plan Proponents, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.    The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

(c) *Exemption from Transfer Taxes*.    In accordance with Bankruptcy Code § 1146(a), the Bankruptcy Court will be requested to make findings, in the Confirmation Order, that the issuance, transfer or exchange of security under the Plan or the making or delivery of an instrument of transfer, shall not be taxed under any law imposing stamp or similar tax. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any stamp or similar tax.

(d) *Interest Accrual*.    No postpetition interest shall accrue on any Claim or scheduled liability (including, but not limited to, Allowed Administrative Expense Claims).

(e) *Allocation of Plan Distributions between Principal and Interest*.    To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and

34

accrued but unpaid interest thereon, such distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first, and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

(f) *Rules of Interpretation; Computation of Time*. For purposes of the Plan, (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document as being in a particular form or containing particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented, (c) unless otherwise specified, all references in the Plan to Sections, Articles, and Exhibits, if any, are references to Sections, Articles, and Exhibits of or to the Plan, (d) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) the rules of construction set forth in Bankruptcy Code § 102 and in the Bankruptcy Rules shall apply. In computing any period of time prescribed or allowed by the Plan, unless otherwise specifically designated herein, the provisions of Bankruptcy Rule 9006(a) shall apply.

(g) *Successors and Assigns*. The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

(h) *Governing Law*. Unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and Bankruptcy Rules, (a) the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the

35

794886-16

Plan, and (b) governance matters shall be governed by the laws of the State of Delaware, without giving effect to the principles of conflict of law thereof.

(i)    *Entire Agreement*.    The Plan and the Plan Documents set forth the entire agreement and understanding among the parties in interest relating to the subject matter hereof and supersede all prior discussions and documents.

(j) *Modification of the Plan*.    The Debtor may alter, amend, or modify the Plan or any Plan Documents under Bankruptcy Code § 1127(a) at any time prior to the Confirmation Date.    After the Confirmation Date and prior to Effective Date of the Plan, the Plan Proponents may, under Bankruptcy Code § 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan so long as such proceedings do not materially or adversely affect the treatment of holders of Claims or Interests under the Plan; provided, however, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or Order of the Bankruptcy Court.

(k) *Vesting of Property of the Debtor*.    On the Effective Date, all of the Debtor's assets shall be vested in the Reorganized Debtor for disposition pursuant to the Plan.

## ARTICLE VII
## RISK FACTORS

Holders of Claims against the Debtor who are entitled to vote to accept or reject the Plan should carefully consider the risk factors set forth below prior to voting to accept or reject the Plan.

794886-16

7.1.    **Bankruptcy Considerations.**

**(A) Failure to Receive Requisite Accepting Votes.**

In order for the Plan to be accepted, of those Holders of Claims who cast ballots, the affirmative vote of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims in each voting class is required.  If the requisite votes are not received to accept the Plan, and if the Plan is not confirmed by the Bankruptcy Court pursuant to the so-called "cram down" provision of section 1129(b) of the Bankruptcy Code, the Debtor may seek to liquidate the Debtor in accordance with chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of a liquidation under chapter 7 of the Bankruptcy Code would be similar to or as favorable to Holders of Claims and Interests as those proposed in the Plan.  The Plan Proponents believe that the financial results would not be as favorable to such Holders in a proceeding under chapter 7 of the Bankruptcy Code.  Specifically, the Plan Proponents submit that the Distribution to Holders of Claims in Classes 1, 2, 3 and 4 would be *de minimis* in a chapter 7 proceeding than under the Plan.

**(B) Risk of Non-Confirmation of the Plan.**

Although the Plan Proponents believe that the Plan satisfies all legal requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan.  There can also be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes to accept or reject the Plan.

**(C)  Risk of Additional or Larger Claims.**

The Disclosure Statement and its attached exhibits necessarily include estimates, including estimates of future events.  These estimates, made by the Debtor, include, but are not limited to estimates as to the total amount of Claims that will be asserted against the Debtor, and

37

the outcome of Disputed Claims. The Debtor believes that the estimates presented are reasonable and appropriate under the circumstances. Nevertheless, there is a risk that unforeseen future events may cause one or more of these estimates to be materially inaccurate. Among the potential risks are the risk that additional prepetition or Administrative Expense Claims may be asserted, that Disputed Claims may be resolved at higher amounts than expected or that the resolution of such Claims may require the expenditure of unanticipated professional fees. If one or more of these estimates proves to be inaccurate, the amount of funds available for Distribution pursuant to the Plan may be reduced.

## ARTICLE VIII
## FEASIBILITY OF THE PLAN

As a condition to confirmation, Bankruptcy Code § 1129(a)(11) requires that the proponents of a plan show that confirmation is not likely to be followed by the liquidation of the debtor or the need for further financial reorganization, unless such liquidation or reorganization is a component of the Plan. The Debtor's current assets consist of a corporate shell valued at approximately $200,000 and some intellectual property valued at approximately $20,000. The Plan provides for the distribution of Reorganized Debtor Reorganized Debtor Common Stock and Reorganized Debtor Convertible Preferred Stock based on the value of these assets and the infusion of assets from Old STW pursuant to the terms set forth in the Plan. Accordingly, the Plan Proponents submit that the requirements of Bankruptcy Code § 1129(a)(11) are largely inapplicable in the Debtor's Bankruptcy Case. The Noteholder Claim of the DIP Lender is impaired and the DIP Lender understands that the possibility of and value of the distribution of Reorganized Debtor Reorganized Debtor Common Stock and Reorganized Debtor Convertible Preferred Stock is speculative.

Nevertheless, Bankruptcy Code § 1129(a)(11) does have limited applicability to the extent that the Plan contemplates that 1,860,000 shares of the Reorganized Debtor

38

Reorganized Debtor Common Stock of the Reorganized Debtor will be distributed to Holders of

Allowed Secured Claims and General Unsecured Claims. Due to this factor, Creditors have a

right to understand whether the Plan is feasible with respect to the Reorganized Debtor.

To demonstrate the feasibility of the Plan as to the Reorganized Debtor, Plan

Proponents, with the assistance of Old STW, have prepared financial projections through the end

of fiscal year 2010, as set forth in Exhibit E to this Disclosure Statement. The projections

indicate that the Reorganized Debtor will have sufficient cash flow to pay and service its debt

obligations and to fund its operations. The projections do not take into account any post-

Effective Date equity raises that the Reorganized Debtor may, in its discretion, seek to

effectuate.

Accordingly, the Plan Proponents believe that the Plan satisfies the feasibility

requirement of Section 1129(a)(11) of the Bankruptcy Code.

### ARTICLE IX
### BEST INTERESTS TEST

Notwithstanding acceptance of a Chapter 11 plan by the required impaired Class,

to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of

each Holder of an impaired Claim that has not voted to accept the Plan. Accordingly, if an

impaired Class does not unanimously accept the Plan, the best interests test of Bankruptcy Code

§ 1129(a)(7) requires that the Bankruptcy Court find that the Plan provides to each Holder of

such Claim or Interest a recovery on account thereof that has a value at least equal to the amount

that such holder would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy

Code.

To estimate the recovery of an impaired holder of a claim or interest under a

Chapter 7 liquidation, the Bankruptcy Court first determines the aggregate dollar amount that

would be available if the Chapter 11 case were converted to a Chapter 7 case and the assets of

794886-16

the debtor liquidated by a Chapter 7 trustee.  The liquidation value would consist of the net proceeds of the disposition of the debtor's assets and cash held by the debtor, reduced by the additional increased costs of liquidation and the Administrative Expense Claims that would arise in a Chapter 7 liquidation case but that do not arise in a Chapter 11 case.

The additional costs and expenses of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee and compensation for services rendered and reimbursement of disbursements incurred on behalf of such trustee's counsel and other professionals, disposition expenses, litigation costs, and claims arising during the pendency of the Chapter 7 liquidation case.  The liquidation itself may trigger certain priority claims, which must be paid out of liquidation proceeds before the balance is made available to pay other claims.

The Chapter 7 distribution and liquidation analysis attached as Exhibit B, which values the reorganization of the Debtor, estimates that each Holder of a Claim in Class 3 (Noteholder Claims) would receive 0% recovery on its Allowed Claim, and each Holder of a Claim in Class 4 (General Unsecured Claims) would receive 0% on account of its Allowed Claim.  As evidenced by this analysis, if the Plan is not confirmed and the Debtor would need to liquidate pursuant to Chapter 7, there would not be available funds to administer an orderly liquidation and compensate a Chapter 7 trustee.  In contrast, pursuant to the Plan it is estimated that the Holders of Class 3 Noteholder Claims and Class 4 General Unsecured Claims will receive a small recovery.  To the extent the Plan is confirmed by the Bankruptcy Court, the DIP Lender has agreed to forego a cash distribution on its Administrative Expense Claim and will receive instead Reorganized Debtor Reorganized Debtor Common Stock and Reorganized Debtor Convertible Preferred Stock.  Under a Chapter 7 liquidation, the DIP Lender is entitled to a Cash distribution, however, under a liquidation scenario there would be no funds for other

40

estate constituencies.  Accordingly, the Plan Proponents believe that the Plan satisfies the best

interest requirement of Section 1129(a)(7) of the Bankruptcy Code.

## ARTICLE X
## TAX CONSEQUENCES

10.1.   **Tax Consequences of Confirmation.**

Circular 230 Disclaimer:  To ensure compliance with requirements imposed by

the Internal Revenue Service (the "IRS"), we inform you that any U.S. federal tax advice

contained in this communication (including any attachments) is not intended or written to be

used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal

Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or

tax-related matter(s) addressed herein.

Confirmation may have federal income tax consequences for the Debtor and Holders of

Claims or Interests.  The Plan Proponents have not obtained and do not intend to request a ruling

from the IRS, nor have the Plan Proponents obtained an opinion of counsel with respect to any

tax matters.  Any federal income tax matters raised by Confirmation of the Plan are governed by

the Internal Revenue Code and the regulations promulgated thereunder.  Creditors are urged to

consult their own counsel and tax advisors as to the consequences to them, under federal and

applicable state, local and foreign tax laws, of the Plan.  The following is intended to be a

summary only and not a substitute for careful tax planning with a tax professional.  The federal,

state and local tax consequences of the Plan may be complex in some circumstances and, in

some cases, uncertain.  Accordingly, each Holder of a Claim is strongly urged to consult with his

or her own tax advisor regarding the federal, state and local tax consequences of the Plan.

10.2.   **Tax Consequences to the Debtor.**  The Debtor may not recognize income as a

result of the discharge of debt pursuant to the Plan because § 108 of the Internal Revenue Code

provides that taxpayers in bankruptcy proceedings do not recognize income from the discharge

41

794886-16

of debt. However, a taxpayer is required to reduce its "tax attributes" by the amount of the debt discharged. Tax attributes are reduced in the following order: (i) net operating losses; (ii) general business credits; (iii) capital loss carryovers; (iv) basis in assets; and (v) foreign tax credits.

10.3. **Disclaimer.** Holders of Claims should not rely on this Disclosure Statement with respect to the tax consequences of the Plan. They should consult with their own tax counsel or advisor. The discussion of tax consequences in this Disclosure Statement is not intended to be a complete discussion or analysis.

**ARTICLE XI**
**SECURITIES LAW MATTERS**
**(Bankruptcy Code § 1145 Exemption)**

RECIPIENTS OF SECURITIES ISSUED UNDER THE PLAN ARE ADVISED TO CONSULT WITH THEIR OWN COUNSEL AS TO THE AVAILABILITY OF ANY OF THE FOLLOWING EXEMPTIONS FROM REGISTRATION UNDER STATE SECURITIES LAWS IN ANY GIVEN INSTANCE AND AS TO ANY APPLICABLE REQUIREMENTS OR CONDITIONS TO THE AVAILABILITY THEREOF.

Upon the Effective Date, the Reorganized Debtor Reorganized Debtor Common Stock and Reorganized Debtor Convertible Preferred Stock will be distributed to the DIP Lender and Creditors entitled to same under the Plan pursuant to the exemption provided by Bankruptcy Code § 1145. Section 1145 of the Bankruptcy Code generally exempts from registration the offer or sale of a debtor's securities of those or an affiliate of, or a successor to, the debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or interest in, or a claim for an administrative expense concerning such debtor. The Plan Proponents believe that the issuance of the Reorganized Debtor Reorganized Debtor Common Stock and

42

794886-16

Reorganized Debtor Convertible Preferred Stock to the DIP Lender and Creditors who are entitled to same under the Plan in exchange for Claims against the Debtor will satisfy the requirements of Section 1145(a) of the Bankruptcy Code.  Therefore, under Section 1145 of the Bankruptcy Code, the issuance of the Reorganized Debtor Reorganized Debtor Common Stock and Reorganized Debtor Convertible Preferred Stock and the subsequent resale of such securities by entities that are not "underwriters" (as defined in Section 1145(b) of the Bankruptcy Code, a "Section 1145 Underwriter") are not subject to the registration requirements of Section 5 of the Securities Act of 1933, as amended (the "Securities Act") or equivalent state securities laws. Thus, such shares will be deemed to have been issued in a registered public offering under the Securities Act and, therefore, the Debtor believes may be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof unless the holder is a Section 1145 Underwriter.  In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code generally defines "underwriter" for purposes of the Securities Act as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities, (d) is an issuer (in this case, the Reorganized Debtor) of the securities within the meaning of section 2(11) of the Securities Act.  The reference contained in Bankruptcy Code § 1145(b)(1)(D) to Section 2(11) of the Securities Act includes as Section 1145 Underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with, an issuer or securities. "Control" (as defined in Rule 405

43

under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of the Reorganized Debtor or its successor, under a plan of reorganization may be deemed to be a "control person," particularly if the management position or directorship is coupled with ownership of a significant percentage of Reorganized Debtor's or its successor's voting securities. Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor that owns at least ten percent (10%) of the securities of the Reorganized Debtor is a presumptive "control person" of Reorganized Debtor. To the extent that persons deemed to be "underwriters" receive Reorganized Debtor Reorganized Debtor Common Stock and Reorganized Debtor Convertible Preferred Stock, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.

## ARTICLE XII
## CONCLUSION

Based on the information in this Disclosure Statement, the Plan Proponents believe that confirmation of the Plan is in the best interests of the Debtor, its bankruptcy estates and holders of Claims against and Interests in the Debtor. Accordingly, the Plan Proponents ask that Creditors vote in favor of the Plan on the enclosed ballot and return the ballot as described above and on the ballot.

## RECOMMENDATION

**THE PLAN PROPONENTS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED ABOVE AND THAT THE PLAN IS DESIGNED TO PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN ANY OTHER FORM OF LIQUIDATION. ANY**

44

OTHER    ALTERNATIVE    WOULD    CAUSE    SIGNIFICANT    DELAY    AND

UNCERTAINTY, AS WELL AS ADDITIONAL ADMINISTRATIVE COSTS.

THUS, THE PLAN PROPONENTS RECOMMEND THAT YOU VOTE TO

"ACCEPT" THE PLAN.

45

794886-16

Dated: November 23, 2009

**WOOZYFLY, INC.**
**Debtor and Debtor-in-Possession**

By:     /s/ Eric Stoppenhagen
Name:   Eric Stoppenhagen
Title:   Interim President

**MKM OPPORTUNITY MASTER FUND, LTD.**
**DIP Lender**

By:     /s/ David Skriloff
Name:   David Skriloff
Title:   Portfolio Manager

46